**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TONY V. RUSSELL | Criminal No. 18-215 (MAS)<br><br>**MEMORANDUM OPINION**<br>**(Under Temporary Seal)** |

This matter comes before the Court on Defendant Tony V. Russell's ("Russell") Motions for Compassionate Release.[1] (ECF Nos. 124, 138.) The Government opposed (ECF No. 143), and Russell replied (ECF No. 144).[2] On March 29, 2021, the Court issued a text order (1) requiring the parties to provide an update regarding Russell's medical conditions and pending placement at FCI Forrest City, and (2) scheduling oral argument on Russell's Motions. (ECF No. 149.) The Government and Russell filed correspondence in response to the Court's text order. (ECF Nos. 150-51, 153.) On April 12, 2021, the Court heard oral argument on Russell's Motions via videoconference. (ECF No. 154.) The parties subsequently filed supplemental correspondence. (ECF Nos. 156-59.) On November 19, 2021, the Court ordered Russell to submit updated correspondence regarding his treatment and symptoms. (ECF No. 160.) The Court also ordered the parties to submit updated medical records for the Court's review. (*Id.*) The Government submitted supplemental correspondence and Russell's updated medical records on December 10

---

[1] Russell filed his original motion *pro se*. (ECF No. 124.) Russell also filed a supplemental *pro se* memorandum in support of his motion. (ECF No. 132.) The Assistant Federal Public Defender subsequently filed a motion and brief in support of Russell's *pro se* motion. (ECF No. 138.)

[2] Due to the sensitive nature of certain filings, the parties filed redacted briefs and submitted unredacted versions of the briefs and supporting exhibits, including medical records, directly to Chambers. The Court has reviewed and considered all submissions in reaching its decision.

and 13, 2021 (ECF Nos. 161-63), and Russell filed correspondence on December 21, 2021 (ECF No. 164). For the reasons set forth below, the Court grants Russell's Motions.

I. **BACKGROUND & PARTIES' POSITIONS**

    A. **Russell's Initial Diagnosis and Facility Shuffling**

Russell was detained on December 31, 2019 (ECF Nos. 105-07) and sentenced on April 29, 2020 (ECF No. 119). Russell spent his initial period of incarceration at Monmouth County Correctional Institution ("MCCI"), followed by Essex County Correctional Facility ("ECCF"). (Def.'s Moving Br. 3, ECF No. 139.) Russell fell and injured himself twice at MCCI and, after transfer to ECCF, fell and injured himself twice more. (*Id.*) An October 5, 2020 neurological evaluation at ECCF revealed that Russell suffers from hereditary peripheral neuropathy, a symptom of which is ataxia, and recommended further testing. (*Id.* at 4.) Russell then contracted COVID-19 and, during his recovery, experienced a new ataxia symptom—incontinence—and urinated on himself numerous times and defecated on himself twice after leaving quarantine on December 4, 2020. (*Id.* at 5.)

The Bureau of Prisons ("BOP") transferred Russell from ECCF to USP Hazelton on or around March 10, 2021. (Gov't's Apr. 5, 2021 Letter 1, ECF No. 150.) USP Hazelton provides "level one" medical care, the lowest tier of the four-tier medical care provided to inmates. (Def.'s Apr. 5, 2021 Letter, ECF No. 151.) Russell, therefore, argued that if he remained in BOP custody, he would only have access to the lowest level of care available within the BOP. (*Id.* at 2.) On April 6, 2021, the BOP transferred Russell to Oklahoma City FTC. (Gov't's Apr. 11, 2021 Letter, ECF No. 153.) Then, the BOP transferred Russell again, this time to FCI Forrest City Medium ("FCI Forrest City") in Arkansas. (Def.'s Apr. 16, 2021 Letter, ECF No. 157.) FCI Forrest City can provide up to level 2 medical care. (Gov't's Apr. 13, 2021 Letter, ECF No. 156.)

B. **Parties' Positions**

Russell originally argued that he was diagnosed with hereditary peripheral neuropathy and suffers from ataxia, "a severe degenerative neurological disease that affects his cerebellum and spinal cord." (Def.'s Moving Br. 1, 4.) Russell also alleged that:

> [a]taxia causes loss of coordination, an inability to control one's limbs, and reduced mobility. Mr. Russell's symptoms began after he was sentenced on this case, and his loss of coordination has caused him to fall four times requiring medical treatment. . . . The cause of his ataxia is currently unknown, and he requires further diagnostic testing as well as rehabilitative treatment, neither of which has been provided to him. To make matters worse, he was recently diagnosed with C[OVID]-19, which has exacerbated his ataxia symptoms. Mr. Russell's ataxia places him at high risk for respiratory complications related to his C[OVID]-19 infection.

(*Id.* at 1.) In addition, Russell indicated that he suffers from asthma, for which he has been prescribed an inhaler. (*See, e.g.*, Apr. 30, 2021 Clinical Encounter Summary.) Russell also argued that he is the sole potential caregiver for his seriously ill wife and son. (Def.'s Moving Br. 8.) According to Russell, his wife suffers from multiple sclerosis that renders her unable to work and his son suffers from severe asthma. (*Id.*) Russell acknowledged, however, that his "own reduced health circumstances will prohibit him from helping in all the ways he once did" but asserted that "he will be able to provide critical childcare support when [his wife] needs to attend medical appointments." (*Id.*)

Russell also emphasized that his illness:

> only became apparent after he began serving his sentence in this case, and since that time it has become progressively worse, radically altering the conditions of his life. His mobility has been drastically reduced; he walks unsteadily with a cane, and his loss of balance and coordination make it difficult for him to use the shower and the toilet.

(Def.'s Reply Br. 2) (citations omitted).

3

In opposition, the Government argued that:

[a]taxia is not a disease, rather, it is: "the symptom of incoordination that may accompany infections, injuries, other diseases, and/or degenerative changes in the nervous system. The symptom of ataxia can be caused by stroke, multiple sclerosis, tumors, alcoholism, peripheral neuropathy, metabolic disorders, and vitamin deficiencies. In these cases, treating the condition that caused ataxia may improve it.

(Gov't's Opp'n Br. 7, ECF No. 143 (citing https://www.columbianeurology.org/neurology/staywell/ataxia).) The Government also noted that a nurse practitioner only found Russell "mildly ataxic" in December 2020 and that another medical record reflects that health practitioners, "[r]emoved problem of ataxia." (*Id.* at 7-8.) In addition, the Government argued that it would be speculative to conclude that Russell's previous COVID-19 infection aggravated his ataxia and asserted that Russell's asthma may account for symptoms such as shortness of breath. (*Id.* at 8.)

Russell's July 22, 2021 correspondence stated that even though three months passed since his arrival at FCI Forrest City, he had not received any physical therapy or any additional diagnostic testing for his hereditary peripheral neuropathy. (Def.'s July 22, 2021 Letter, ECF No. 158.) Russell asserted that, "[g]iven the extent of the medical record before the Court, the complete absence of any treatment or testing over this extended period of time demonstrates that the BOP either cannot or will not provide Russell with an adequate level of care." (*Id.*)

With respect to FCI Forrest City, the Government's September 9, 2021 correspondence indicated that Russell received a neurological examination related to his hereditary neuropathy on or about August 24, 2021, and that Russell's hereditary neuropathy "continues to be assessed." (Gov't's Sept. 9, 2021 Letter, ECF No. 159.) According to the Government, Russell also receives ongoing medical care for his other conditions, such as hypothyroidism and prediabetes. (*Id.*)

4

In his December 2021 correspondence, Russell argued that he has been incarcerated at FCI Forrest City for eight months but has received minimal care and his health has continued to deteriorate. According to Russell,

> Over the past eight months BOP health services has engaged with Mr. Russell's hereditary peripheral neuropathy [in] what can only be described as a minimal way. Despite various appointments, it is an inescapable fact that although eight months have passed, he has not received the treatment and testing called for by his serious, chronic, debilitating condition. He has not received a single session of physical therapy, nor has he undergone a sural nerve biopsy. . . .
>
> In the absence of proper care, Mr. Russell's condition has worsened. He now uses a walker instead of a cane. On September 13, 2021, he was taken to health services due to a fall getting out of the shower, which he later described as leg weakness. He reports to counsel that his lack of coordination, his inability to sense the movement and location of his legs, causes him to walk into people. He cannot fold his own sheets, he frequently drops his handheld radio, and he has lost his ability to write legibly. Moreover, his housing unit is located approximately 1/2 a mile from the mess hall, requiring him to walk several miles a day to get his meals, a task which is incredibly difficult for him in his condition.

(Def.'s Dec. 21, 2021 Letter 2-3 (internal citations omitted), ECF No. 164.)

## II.   **LEGAL STANDARD**

A district court generally has limited authority to modify a federally-imposed sentence once the sentence commences. *See United States v. Epstein*, No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020); *Dillon v. United States*, 560 U.S. 817, 825 (2010). The compassionate release statute, as amended by the First Step Act ("FSA"), permits district courts to grant sentence reductions for myriad reasons. 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides, in relevant part, as follows:

> (A) the court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction.

*Id.*

The Court can grant Russell's Motions if it finds that a sentence reduction "is (1) warranted by 'extraordinary and compelling reasons'; (2) 'consistent with applicable policy statements issued by the Sentencing Commission'; and (3) supported by the traditional sentencing factors under 18 U.S.C. § 3553(a), to the extent they are applicable." *United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021) (citing 18 U.S.C. § 3582(c)(1)(A)).

### III.  DISCUSSION

The Court finds that Russell has demonstrated sufficient "extraordinary and compelling reasons" to support compassionate release.

In conducting its extraordinary and compelling analysis, the Court is not bound by the Sentencing Commission's policy statement, U.S.S.G. § 1B1.13, as "the text of the policy statement explicitly limits its application to Bureau-initiated motions." *Andrews*, 12 F.4th at 259. Russell initiated these Motions, rendering the policy statement "inapplicable" since by its very terms it applies only "[u]pon motion of the Director of the [BOP]." *Id.* (citing U.S.S.G. § 1B1.13). The Court thus can freely consider the medical and caregiver reasons proffered by Russell, and in doing so may use the policy statement as a guide in determining whether extraordinary and compelling reasons are present. *Id.*; *see also United States v. Jefferson*, No. 21-2020, 2021 WL 4279626, at *2 (3d Cir. Sept. 21, 2021) (a district court may "consider the policy statement in its 'extraordinary and compelling' analysis, even if the policy statement is not ultimately binding on the court."). Here, the Court finds in its discretion that Russell has presented extraordinary and compelling reasons. Specifically, a review of the briefing and medical evidence reveals that Russell's medical condition is a compelling reason warranting release.

Russell's medical records demonstrate that he has only received minimal medical care at FCI Forrest City. The Government's September 9, 2021 correspondence asserts that Russell's hereditary neuropathy "continues to be assessed." (Gov't's Sept. 9, 2021 Letter.) But one of the medical records stated: "So far, the only pending study by the initial consulting Neurologist (see entry in BMER from 5/28/21) is the sural nerve biopsy. A/P: Unspecified Neuropathy – [w]ill [follow up] with [patient] next week and *then gauge need to refer to Neurologist.*" (Aug. 26, 2021 Clinical Encounter – Administrative Note) (emphasis added). The underlying medical records reflect hereditary periphery neuropathy and ataxia yet, as of August 2021, FCI Forrest City was only in the process of determining the "*need to refer* to Neurologist." (*Id.*) (emphasis added). The updated medical records reflect minimal care, at best. Here, the Court finds persuasive Defendant's argument that:

> [t]here is no basis in the record for this Court to have any confidence that Mr. Russell will receive physical therapy or a sural nerve biopsy if he remains incarcerated and under the care of BOP health services. The surest and perhaps only path towards the proper treatment he urgently needs is his release from prison. Every day that he remains incarcerated is another day where his condition will inevitably worsen and where he is exposed to further falls.

(Def.'s Dec. 21, 2021 Letter 3.) Further, other courts within this District have similarly found a defendant's declining health conditions and the lack of adequate treatment in prison may constitute extraordinary and compelling reasons. *See, e.g.*, *United States v. Moe*, --- F. Supp. 3d ---, 2021 WL 5277202, at *6-7 (D.N.J. Nov. 12, 2021) (finding, among other factors, that defendant's worsening medical conditions and risk of insufficient medical treatments during incarceration are extraordinary and compelling reasons). The Court finds that Russell has sufficiently presented extraordinary and compelling reasons.

The Court also finds that Russell does not present "a danger to the safety of any other person or to the community[.]" U.S.S.G. § 1B1.13(2). Russell will be required to spend the

7

unserved portion of his sentence on home confinement under the supervision of the Probation Department. The Court recognizes that Russell has a history of non-compliance with supervision. Specifically, while on release and pending sentencing for the current offense, Russell was arrested for a drug-related offense. (Gov't's Opp'n Br. 2.) Russell also failed to attend court-ordered drug treatment and failed to appear for required drug testing while on pretrial release. (Sentencing Tr. 29:22-30:3, ECF No. 127.) Russell, however, did not suffer the significant effects of hereditary periphery neuropathy during this period. Significantly, Russell has also successfully completed the Residential Drug Abuse Treatment ("RDAP") Program in prison. Russell's need to concentrate on treatment for his significant health issues, his successful completion of the RDAP Program, and his supervision by the Probation Department all lend to the Court's finding that Russell does not pose a threat to the public.

In reaching its decision, the Court has also considered the 18 U.S.C. § 3553(a) sentencing factors. *See* 18 U.S.C. 3582(c)(1)(A) (explaining that the Court must consider, among other things, "the factors set forth in section 3553(a) to the extent that they are applicable"). The following § 3553(a) factors are relevant to this decision: "(1) the nature . . . of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment[.]" 18 U.S.C. § 3553(a).

First, the Court acknowledges that Russell committed a serious offense and has a prior criminal history. The record reflects that on July 12, 2018, Russell pleaded guilty to conspiracy to defraud the United States. (J. 1, ECF No. 121.) The Court sentenced Russell to a 48-month term

of imprisonment and ordered restitution in the amount of $241,185.00.[3] (*Id.* at 2, 7.) At the time of his sentencing, Russell had a criminal history category of 6 and had spent over 20 years in prison. (Sentencing Tr. 29:9-11.) The Court, nonetheless, cannot disregard Russell's deteriorating medical condition and his need for proper diagnosis and adequate treatment.

As to the second factor, due to his participation in the RDAP Program, Russell appears to have now completed a substantial portion of his sentence. Russell indicated that:

> Mr. Russell has now served 25 months of incarceration and he has suffered terribly during that time as the symptoms of his hereditary peripheral neuropathy have revealed themselves and worsened. At the time that counsel filed the original motion for compassionate release Mr. Russell had a projected release date of April 14, 2023. But due to Mr. Russell's participation in the RDAP residential drug program BOP has moved his protected release date up by five months and it is now November 8, 2022. He is likely to receive release to a halfway house in early May 2022, a mere five months from the time of this writing.

(Def.'s Dec. 21, 2021 Letter (internal citations omitted).) Russell has appeared to suffer significantly in prison and was diagnosed after his original sentencing. The Court, consequently, finds that the current sentence imposed will continue to reflect the seriousness of his offense, promote respect for the law, and provide just punishment. Furthermore, the public will be protected from further potential criminal conduct because Russell will remain on home confinement until the unserved portion of his sentence is complete.

---

[3] The overall conspiracy scheme resulted in a $1,694,545 total tax loss to the Government. (Gov't's Opp'n Br. 2.) Russell was directly involved in preparing or assisting in preparing tax returns that caused a $486,386 tax loss to the United States. Restitution was set at $241,185 "(a)fter taking into account the overpayments of refunds that the IRS was able to recover from certain taxpayers[.]" (*Id.* at 2 n.2)

## IV. CONCLUSION

The Court grants Russell's Motions. The Court will issue an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp<br>
**MICHAEL A. SHIPP**<br>
**UNITED STATES DISTRICT JUDGE**